## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| ROGER BECKER, | Civil No. 14-5104 (JRT/BRT) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| JOSTENS, INC., | |
| Defendant. | |

Lawrence P. Schaefer, David C. McDonald, and Peter Christian, **SCHAEFER HALLEEN LLC**, 412 South Fourth Street, Suite 1050, Minneapolis, MN 55415, for plaintiff.

Kathryn Mrkonich Wilson, Claire Deason, and Anthony De Sam Lazaro, **LITTLER MENDELSON, PC**, 80 South Eighth Street, Suite 1300, Minneapolis, MN 55402, for defendant.

Plaintiff Roger Becker brings this action against his former employer, Defendant Jostens, Inc., alleging that Jostens fired him in retaliation for making protected complaints about workplace sexual harassment, sexual orientation discrimination, retaliation, battery, and criminal disorderly conduct, all perpetrated by Ann Carr, his supervisor and the sister-in-law of Jostens' CEO, Charles Mooty. Becker asserts claims under Title VII, the Minnesota Human Rights Act ("MHRA"), and the Minnesota Whistleblower Act ("MWA"). Becker also brings a defamation claim, alleging that Jostens' general counsel, Cathy Landman, accused him of lying. Jostens now moves for summary judgment on all claims, and Becker appeals United States Magistrate Judge

Becky Thorson's order denying his motion to amend his complaint to seek punitive damages for his MWA claim.

Because Becker has not established a prima facie case under the MWA, the Court will grant summary judgment for Jostens on that claim and also deny as moot Becker's appeal of the Magistrate Judge's order. The Court will also grant summary judgment for Jostens on Becker's defamation claim because Becker has not established that there is genuine issue of material fact regarding whether the alleged defamatory statements were false. However, the Court will deny Jostens' summary judgment motion with respect to Becker's Title VII and MHRA claims because Becker has made a prima facie case that he was terminated for engaging in protected conduct, and there is a genuine issue of material fact regarding whether Jostens' proffered reason for terminating Becker was pretextual.

## BACKGROUND

### I.    FACTUAL HISTORY

Jostens hired Becker as a Creative Director in its Marketing Department in August 2013. Jostens did not have a CEO at the time, but hired Charles Mooty to fill the role several months later, in January 2014. After Mooty came on board, Jostens created a new executive position, Chief Marketing Officer ("CMO"). Jostens interviewed multiple candidates but ultimately hired Mooty's sister-in-law, Ann Carr. Becker participated in the interview process and endorsed Carr's hiring, although he was unaware of Carr's

relationship to Mooty at the time.  (Aff. of Kathryn Mrkonich Wilson ("Wilson Aff."), Ex. A ("First Becker Dep."), Ex. 11 at 59-60, Feb. 2, 2016, Docket No. 67.)

Jostens' Employee Handbook includes a section covering the employment of relatives.  (Aff. of Lawrence P. Schaefer ("Schaefer Aff."), Ex. D ("Second Stute Dep."), Ex. 1 at 51-52, Feb. 23, 2016, Docket No. 74.)  Although the company does not prohibit the hiring of family members of current employees, family members cannot have "the ability to directly or indirectly influence employment decisions that may affect one another."  (*Id.*)  As an example, the Handbook explains that "one person cannot occupy a position that gives them the ability to make employment or compensation decisions that affect their family member."  (*Id.*)  The Handbook also provides that "Jostens makes the final determination regarding situations of potential conflict."  (*Id.*)  In her role as CMO, Carr reported directly to Mooty, which is an apparent violation of Jostens' Handbook. (Schaefer Aff., Ex. C ("Mooty Dep.") at 64:12-14.)  Despite this apparent violation, Mooty testified that the company's board of directors was aware of and approved of Carr's hire.  (*Id.* at 81:2-15.)  Mooty also testified that Jostens put certain "safeguards" in place to ensure that any conflicts of interest involving him and Carr "were being handled in the most objective way."  (*Id.* at 81:13-15.)  According to Mooty, "any concerns that anybody might have as it relates to an issue with" Carr would "go directly to Cathy [Landman, Jostens' General Counsel,] or to Natalie [Stute, a Vice President of Human Resources,] or to Marie [Hlavaty, the General Counsel of Jostens' parent company, Visant Corporation]," and not him.  (*Id.* at 81:24-82:8.)

As CMO, Carr became Becker's immediate supervisor.  In April 2014, Carr promoted Becker to the position of Senior Creative Director, which included a pay increase of $13,000.  (Schaefer Aff., Ex. A ("Second Becker Dep.") at 155:15-156:10.) Shortly thereafter, however, Becker's working relationship with Carr began to deteriorate.  On May 1, 2014, Becker met with Julie Maeyaert, an HR representative, to discuss his concerns about Carr's leadership style.  (*See id.* at 181:11-182:13; Schaefer Aff., Ex. B ("First Maeyaert Dep.") at 155:19-158:4.)  According to Becker, Maeyaert was not receptive to his feedback and instead told him that her role was "to 100% support Ann Carr and make her look and be successful," although Maeyaert disputes Becker's characterization of her statement.  (Second Becker Dep., Ex. 1 ("May 29 Compl.") at 42; Second Becker Dep. at 181:17-182:13; First Maeyaert Dep. at 157:3-20.)

Several weeks later, on May 13, 2014, Carr and Maeyaert met with Becker to inform him that Jostens had received several complaints about Becker's behavior at a recent meeting and in the office generally.  (First Becker Dep. at 197:9-198:23.)  Two of the complaints came via an anonymous employee hotline.  (Wilson Aff., Ex. B ("Second Maeyaert Dep."), Ex. 96.)  On May 19, 2014, Becker received a written warning co-authored by Carr and Maeyaert, which outlined Becker's alleged unprofessional conduct and warned Becker that if his behavior did not "improve to an acceptable level," Jostens would take "additional corrective action, up to and including termination of employment."  (May 29 Compl. at 35-36; First Becker Dep. at 197:19-25.)  The warning included a receipt acknowledgement signature line, but Becker refused to sign it and

instead told Carr that he would be writing a "rebuttal" complaint.  (May 29 Compl. at 36; First Becker Dep. at 200:21-201:7.)

On May 29, 2014, Becker emailed a formal sixteen-page rebuttal complaint regarding Carr to Natalie Stute.  (May 29 Compl. at 34.)  Becker titled the complaint "Sexual Harassment, Bullying, Discrimination and Hostile Work Environment at Jostens Created by CEO's Sister In Law – Ann Carr, CMO."  (*Id.* at 37.)  Becker summarized the purpose of his complaint as follows:

> I feel in no uncertain terms that I and others are being discriminated and retaliated against because of our reports and opposition to Ann's harassing and bullying tactics in the workplace.  She has created an unworkable, dysfunctional and hostile work environment at Jostens.  I believe her latest tactics; threats and warnings are in an attempt to fire me before I can fully expose her.  She has threatened my job too many times.  I am demanding a full investigation of Ann Carr and further request that she discontinue all discriminatory, retaliatory, hostile, harassing and abusive behavior and conduct towards me and **all** other employees at Jostens, I ask that Ann no longer has any contact with me and ask I report to a different Jostens leader.

(*Id.* at 52.)  Becker also outlined Carr's allegedly inappropriate conduct in timeline form, including the following relevant complaints:

- On March 24, 2014, Becker alleges that Carr hugged him and "buried [his] face in her breasts," which made him feel "uncomfortable."  (*Id.* at 37.)

- On April 10, 2014, Becker alleges that Carr told him that she thought he had "some real cool friends" and she "bet" he was "real wild."  Carr also "wiggl[ed] her lips" as she spoke.  Becker contends that he believed the comments had a "sexual overtone," which he "didn't like."[1]

---

[1] This entry is not actually included in the Becker's May 29 complaint.  According to Becker, he forgot to include it and sent it separately to Stute as a "supplement" at a later time. (First Becker Dep. at 153:13-154:1; *id.*, Ex. 19 at 62.)

- During a staff meeting on May 5, 2014, Becker alleges that Carr told him: "[Y]ou are so too cute to look at; I probably shouldn't say that out loud. I could get into trouble with HR." Becker contends that this comment made him feel "very uncomfortable" and that "it was gross." (*Id.* at 42.)

- On May 8, 2014, Becker alleges that a co-worker, Mike Wolf, told him that Carr "punched" Wolf "so hard" and "humiliated" him "in public" the prior week. (*Id.* 44.)

- On May 23, 2014, Becker alleges that Carr "poked [him] hard with 3 fingers in [his] right back/shoulder." Becker contends that the poke "actually hurt a moment," and that he thought to himself, "I don't want [Carr] to touch or poke me ever." (*Id.* at 48.)

Becker described other incidents in which Carr used profane language, such as "little bitch," "bull-shitter," and "fucking." (*See id.* at 37, 41, 49.) Becker also provided examples of times when Carr verbally humiliated him and others during group meetings and one-on-one interactions. (*See id.* at 37-52.)

When Stute received Becker's complaint, she immediately forwarded it to Mooty as an email attachment. (Second Stute Dep., Ex. 40 at 108.) In her email, Stute noted that she "wanted to give [Mooty] a heads up," and that she hoped "to connect with [Mooty] about [the complaint] and how [she] anticipate[d] approaching it." (*Id.*) Mooty replied within ten minutes, writing that he would "read [the complaint] over in the morning" and asking that Stute call him then. (*Id.*) Mooty also shared his thoughts as to how he would handle the situation: "[M]y approach would be to have you share the comments with Ann. We will then have to regroup on an approach both before and after talking with Ann." (*Id.*)

On May 30, 2014, Stute began investigating Becker's complaint. (Wilson Aff., Ex. E ("Stute Decl.") ¶ 10.) Stute spoke over the phone with Becker on May 30 and met

with him in person on June 2.  (*Id.* ¶¶ 12-13.)  As a part of the investigation, Stute also spoke to at least thirteen different Jostens employees, including Carr herself, to whom she disclosed Becker's identity.  (*Id.* ¶ 11; Schaefer Aff., Ex. G ("Carr Dep.") at 114:14-116:9.)  By June 6, 2014, Stute completed her investigation and concluded that Becker's claims of illegal conduct were "unfounded."  (Wilson Aff., Ex. D ("First Stute Dep.") at 334:1-338:12.)    Nevertheless, Stute contends that she decided to restructure the Marketing Department so that Becker would no longer report to Carr.  (Stute Decl. ¶14.)  Stute planned to announce the restructuring on July 17, 2014.  (*Id.* ¶ 32.)  Stute also decided that Carr would participate in an executive coaching program.  (*Id.* ¶ 15.)  Stute's decision to have Carr receive executive coaching was not based solely on Becker's complaint.  In May and June of 2014, at least fifteen other employees made verbal and written complaints about Carr's leadership style.  (*See* Pl.'s Mem. in Opp'n at 11 n.4, Feb. 23, 2016, Docket No. 73.)

Despite Stute's investigation, Becker contends that Carr retaliated against him almost immediately after he submitted his May 29 complaint.  Becker reported this alleged retaliation to Stute and others on at least June 6 and 7.  (Second Stute Dep., Exs. 45; Second Becker Dep., Ex. 42.)  According to Becker, Carr excluded him from aspects of a video project he was working on with one of Jostens' vendors, Pixel Farms.  (Second Stute Dep., Ex. 45 at 119.)  Becker noted in one of his complaints that he was concerned that Carr was "set[ting him] up to fail."  (*Id.*)

On June 13, 2014, Becker submitted another written complaint to Stute, recounting complaints about Carr allegedly made by Tammy Kimbler, an executive

producer for Pixel Farm.  (*Id.*, Ex. 48 ("June 13 Compl.") at 134.)  Becker contends that

he initially relayed Kimbler's complaints to Stute verbally, but Stute asked him to put the

complaint in writing, which he did.  (Second Becker Dep. at 244:8-18; Second Stute Dep.

at 353:18-354:19.)  In this written complaint, Becker alleged that Kimbler told him that

Carr was difficult to work with and that Kimbler found it odd that Carr had excluded

Becker from the video project.  (June 13 Compl. at 134-35.)  Becker also alleged that

Kimbler told him that Carr demanded that Pixel Farm cast Carr's niece, Jill Sampson, in

the video project.  (*Id.* at 134.)  Becker contends that Kimbler told him that she had to

"cancel" Sampson's participation "because it's against Pixel Farm's company policy to

practice in that business manner plus the nepotism piece is wrong."  (*Id.*)  Becker

additionally alleged that Kimbler told him that Carr directed Kimbler to use a casting

agency where Carr's sister, Lucia Stuessi, worked.  (*Id.*)

Upon receiving this new complaint, Stute again investigated.  As a part of the

investigation, Stute interviewed Carr and Kimbler and also met with Mooty.  (Stute Decl.

¶¶ 23-24; Second Stute Dep. at 355:11-25.)  Carr disputed Becker's account, telling Stute

that she had not directed Pixel Farm to hire Sampson, but rather, that she had requested

that Pixel Farm remove Sampson from the project once she found out about her niece's

casting.  (Stute Decl. ¶ 23.)  Carr provided copies of emails that she sent Kimbler to

verify her version of events.  (First Stute Dep., Ex. 49 at 138.)  In one of the emails, sent

from Carr to Kimbler on June 6, Carr wrote:

> Hi Tammy, Is there an opportunity to eliminate one of the cast pics for
> them anthem video?  It looks like my niece is in the casting photos –

> because this is a conflict of interest for both Chuck and I we would like to
> request that she is not in the line up.

(*Id.*)  When Stute interviewed Kimbler over the phone, Kimbler confirmed that Carr had

no involvement in the initial casting decisions, did not direct Pixel Farm to use her

sister's casting agency, did not demand that Sampson be cast, and actually requested that

Sampson be removed from the project.   (Stute Decl. ¶¶ 25-30; Wilson Aff., Ex. H

("Kimbler Dep.") at 64, 72-73.)

On June 16, 2014, Stute emailed Mooty and told him that she planned to delay

announcing the restructuring of the Marketing Department and Becker's new reporting

chain because she wanted to continue investigating the veracity of Becker's June 13

complaint.  (Stute Decl. ¶¶ 31-32.)  Stute wrote that she was concerned that "Becker had

attributed false statements to Ms. Kimbler" and wanted to speak with Becker to get his

side of the story.  (*Id.* ¶ 33.)  Stute told Mooty that if it turned out that Becker "lied about

it, we will move forward and terminate him."  (*Id.*, Ex. 50 at 153.)

Stute and Cathy Landman, Jostens' General Counsel, met with Becker on June 17,

2014.  (Stute Decl. ¶ 34.)  Stute informed Becker that she had spoken with Kimbler and

Carr, and they had both refuted his version of events.  (*Id.*)  Becker, however, insisted

that his representations about Kimbler's comments were accurate.  (*Id.*)  After the

meeting was over, Stute met with Landman "and received legal advice."  (*Id.* ¶ 35.)  At

that time, Stute contends that she made the decision to terminate Becker's employment.

According to Stute, this decision was based in part on her assessment that Becker made

claims about Carr and Mooty "that were false and untrue," giving rise to "serious

concerns about [Becker's] integrity and credibility." (*Id.* ¶ 37.) Stute also based her decision on the fact that Becker had previously received a written warning in May about his lack of professionalism. (First Stute Dep. at 362:20-22.) Although Stute asserts that the decision to terminate Becker was hers alone, she admitted in her deposition that Mooty "was aware" of her decision and that he "support[ed]" it. (*Id.* at 363:11-364:4.)

On the afternoon of June 17, Stute and Landman reconvened with Becker to inform him that his employment was terminated, effective June 18, 2014. During that meeting, Landman told Becker that Jostens had concluded that he was "lying" about Kimbler's comments and that he had made "false accusations" about Carr in his June 13 complaint. (First Becker Dep. at 291:23-292:2.)

## II.     PROCEDURAL HISTORY

Becker commenced this action against Jostens in Minnesota state court, and Jostens removed it to federal court on December 31, 2014. In his complaint, Becker brings claims under Title VII, the MHRA, and the MWA, alleging that he was terminated in retaliation for making protected complaints about Carr. Becker also brings a defamation claim based on Landman's statements during the June 17 termination meeting. Jostens has now moved for summary judgment on all claims. Becker also appeals the Magistrate Judge's order denying his motion to amend his complaint to seek punitive damages in connection with his MWA claim.

# ANALYSIS

## I.   STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a).   A fact is material if it might affect the outcome of the lawsuit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).   Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   "To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial."   *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247-49).

## II.   TITLE VII AND MHRA CLAIMS

Title VII prohibits an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII] . . . or

participated in any manner in an investigation . . . under [Title VII]." 42 U.S.C. § 2000e-3(a). The MHRA includes a similar provision: "It is an unfair discriminatory practice for any . . . employer . . . to intentionally engage in any reprisal against any person because that person . . . opposed a practice forbidden under [the MHRA] . . . or participated in any manner in an investigation . . . under [the MHRA]." Minn. Stat. § 363A.15(a). "[R]etaliation claims under Title VII and the MHRA are governed by the same standards." *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1015 n.3 (8th Cir. 2011); *see Bahr v. Capella Univ.*, 788 N.W.2d 76, 83 (Minn. 2010) ("In construing the MHRA, we apply law developed in federal cases arising under Title VII of the 1964 Civil Rights Act."). Thus, "[t]o survive a motion for summary judgment on a retaliation claim" under either statute, the plaintiff "must offer direct evidence of retaliation or create an inference of retaliation under the *McDonnell Douglas* burden-shifting framework." *Hutton v. Maynard*, 812 F.3d 679, 683 (8th Cir. 2016) (citing *Lors v. Dean*, 746 F.3d 857, 865 (8th Cir. 2014)).

Here, Becker argues that Jostens violated Title VII and the MHRA by terminating him in retaliation for (1) complaining about Carr's sexual harassment; (2) complaining about Carr's retaliation in response to his May 29 written complaint; (3) participating in the investigation of his own complaints; (4) complaining about Carr's sexual orientation discrimination; and (5) assisting in the investigation of a complaint filed by one of his co-workers, Jill Bley. Becker further asserts that his claim is cognizable based on both direct evidence and the *McDonnell Douglas* burden shifting framework.

### A.    Direct Evidence

"Direct evidence of discrimination must show 'a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action.'"   *Id.* (quoting *Russell v. City of Kansas City*, 414 F.3d 863, 866 (8th Cir. 2005)).   "Direct evidence encompasses comments or statements indicating discriminatory intent, where those comments are made by people with decision-making authority."   *Id.* (citing *Moody v. Vozel*, 771 F.3d 1093, 1096 (8th Cir. 2014)). Importantly, direct evidence refers to "'the causal strength of the proof, not whether it is "circumstantial" evidence.'"   *Id.* at 684 (quoting *Lors*, 746 F.3d at 865).   Thus, "[s]trong circumstantial evidence may also constitute direct evidence."   *Id.* (citing *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004)).

Here, Becker contends that he has direct evidence of unlawful retaliation based on (1) statements that Carr made during her deposition for this case, and (2) Mooty's alleged reaction to Becker's complaints.   For the reasons that follow, however, the Court finds that this evidence does not constitute direct evidence.

With respect to Carr, Becker relies on deposition testimony in which Carr stated that Becker's complaints were "false," "very disturbing," "completely unfair," and "very, very dark and offensive."   (Carr Dep. at 86:12-89:14.)   Becker contends that these statements evidence her intent to engage in unlawful retaliation – she fired him for making protected complaints.   Yet even if the Court assumes that Carr had decision-making authority with respect to Becker's termination, this cited testimony does not rise

to the level of showing a specific link between the alleged discriminatory animus and the challenged decision. Carr was upset about Becker's complaints against her, an understandable reaction. But simply being upset is not evidence upon which a reasonable fact finder could conclude that an illegitimate criterion actually motivated Becker's termination, particularly when Carr's comments came during a deposition many months after the events at issue.

With respect to Mooty, Becker relies on information that he learned from one of Jostens' business consultants, Donna Dimenna, who told him that Mooty was "spinning" over Becker's allegations. Yet once more, this circumstantial evidence is not strong enough to establish a specific link between the alleged discriminatory animus and the challenged decision. While Becker speculates as to what "spinning" might mean, he offers no other evidence to firmly explain or place in context Mooty's alleged reaction. Thus, while Mooty's purported reaction could be relevant to the questions of causation and pretext under the *McDonnell Douglas* framework, it is insufficient to constitute direct evidence of retaliation.

### B.    *McDonnell Douglas* Framework

Absent direct evidence of retaliation, "the familiar three-step burden-shifting analysis from *McDonnell Douglas* applies." *Hutton*, 812 F.3d at 684 (citing *Ellis v. Houston,* 742 F.3d 307, 319 (8th Cir. 2014)).

> Under the *McDonnell Douglas* framework, [Becker] has the initial burden of establishing a prima facie case of retaliation. To establish a prima facie case, [Becker] must show: (1) [he] engaged in protected conduct; (2) [he] suffered materially adverse employment action, action that would deter a

> reasonable employee from making a charge of employment discrimination
> or harassment; and (3) the materially adverse action was causally linked to
> the protected conduct.   If [Becker] establishes a prima facie case, the
> burden shifts to [Jostens] to articulate a legitimate, non-retaliatory reason
> for its action. The burden then shifts back to [Becker] to put forth evidence
> of pretext, the ultimate question being whether a prohibited reason, rather
> than the proffered reason, actually motivated the employer's action.

*Fercello v. Cty. of Ramsey*, 612 F.3d 1069, 1077-78 (8th Cir. 2010) (citations and internal

quotation marks omitted).

### 1.    Prima Facie Case

Pursuant to the above framework, the first question is whether Becker has satisfied

his burden of establishing a prima facie case of retaliation under Title VII and the

MHRA.  For the reasons that follow, the Court finds that he has.

### a.   Protected Conduct

Becker first alleges that he engaged in protected conduct under Title VII and the

MHRA by complaining about workplace sexual harassment perpetrated by Carr.  Becker

points to three incidents that he reported in his May 29 complaint: (1) the March 24 hug,

when Carr allegedly "buried [Becker's] face in her breasts"; (2) an interaction on

April 10, in which Carr allegedly told Becker that he must have "some real cool friends,"

said that she "bet" he was "real wild," and "wiggl[ed] her lips" in a manner Becker

perceived as being sexual; and (3) an incident on May 5, in which Carr purportedly told

Becker that he was "too cute to look at."  (May 29 Compl. at 37, 42; First Becker Dep.,

Ex. 19 at 62.)

- 15 -

An employee alleging retaliation based on a complaint to an employer need not show that the underlying complained-of conduct was actually unlawful; instead, the employee need only show that he or she had "a good faith, objectively reasonable belief that the practices were unlawful." *Pye*, 641 F.3d at 1020 (quoting *Bonn v. City of Omaha,* 623 F.3d 587, 591 (8th Cir. 2010)).   Thus, the key inquiry is not whether Carr actually sexually harassed Becker, but rather, whether Becker's complaint demonstrates that he had a good faith, objectively reasonable belief that she did.

Jostens argues that Becker's complaint was not protected activity because the three incidents he complained of fall significantly short of actionable sexual harassment. The Court agrees that the incidents do not amount to actionable sexual harassment because they were not "so severe or pervasive as to alter the conditions of [Becker's] employment and create an abusive working environment." *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001) (quoting *Faragher v. City of Boca Raton,* 524 U.S. 775, 786 (1998)); *Rasmussen v. Two Harbors Fish Co.*, 832 N.W.2d 790, 796-79 (Minn. 2013) (applying "severe or pervasive" standard to MHRA sexual harassment claim). Nevertheless, the Court still finds that Becker's complaints were protected activity because his belief that Carr engaged in unlawful sexual harassment was objectively reasonable.   Importantly, the incidents occurred over a short period of time – five and a half weeks – and involved both unwanted physical contact and sexually suggestive comments.   A reasonable person in Becker's shoes would have been justified in concluding that this behavior was sufficiently severe and pervasive to be actionable, and the tone and content of Becker's complaint demonstrates that his belief was taken in good

faith.[2]  Accordingly, even though Becker's assessment of Carr's purported sexual harassment was inaccurate, his good faith, objectively reasonable complaint was sufficient to trigger the protections of Title VII and the MHRA.

Becker also contends that he engaged in protected conduct by complaining to Stute on at least June 6 and June 7 that Carr, in retaliation for his May 29 complaint, excluded him from the Pixel Farm video project.  (Second Stute Dep., Exs. 45; Second Becker Dep., Ex. 42.)  Without deciding whether Carr's alleged retaliation was in fact unlawful, the Court finds that Becker had an objectively reasonable belief that it was, and therefore, that his retaliation complaints constituted protected activity.  An objectively reasonable person in Becker's position could have concluded that being excluded from an important work project constituted an adverse employment action.  *See Weger v. City of Ladue*, 500 F.3d 710, 726 (8th Cir. 2007) (noting that an employment action is adverse if "a reasonable employee in the plaintiff's position might have been dissuaded from making a discrimination claim because of the employer's retaliatory actions").  And because this alleged retaliation occurred only days after Becker submitted his initial protected complaint about Carr's sexual harassment, it was objectively reasonable for him to conclude that the events were connected.  *See Gibson v. Geithner*, 776 F.3d 536,

---

[2] Jostens argues that Becker could not have in good faith believed that the hug incident constituted sexual harassment because he stated in his deposition that he initially believed it "could be a clumsy mistake."  (First Becker Dep. at 41:14-42:21.)  The Court, however, is unpersuaded, as Becker also made it clear in his deposition that his opinion of the hug changed before he submitted his May 29 complaint and that although he initially gave Carr the "benefit of the doubt," he eventually came to believe that the hug constituted sexual harassment.  (*Id.* at 38:8-39:22, 41:7-13, 42:15-43:6.)

541 (8th Cir. 2015) ("Proximity alone can be enough to establish causation for a *prima facie* case.").

Becker thirdly asserts that he engaged in protected conduct by participating in the internal investigation of his own sexual harassment and retaliation complaints. Title VII and the MHRA, in addition to protecting employees who complain about or oppose unlawful conduct, also protect employees who participate in investigations under the statutes. *See* 42 U.S.C. § 2000e-3(a); Minn. Stat. § 363A.15; *see also Hunt v. Neb. Pub. Power Dist.*, 282 F.3d 1021, 1028 (8th Cir. 2002) ("Title VII prohibits employers from retaliating against an employee who is engaged in a protected activity, which can be either opposing an act of discrimination made unlawful by Title VII ('the opposition clause'), or participating in an investigation under Title VII ('the participation clause')."). Although the Eighth Circuit has not defined the "precise point" at which such an investigation begins, it has held that "[a]t a minimum there would have to be factual allegations of discrimination against a member of a protected group and the beginning of a proceeding or investigation." *Brower v. Runyon*, 178 F.3d 1002, 1006 (8th Cir. 1999). Applying this law, the Court finds that an investigation was underway, and Becker participated in that investigation. Becker's complaints on May 29, June 6, and June 7 included factual allegations of unlawful discrimination relating to sexual harassment and retaliation perpetrated by Carr; Stute indisputably commenced an investigation into those complaints; and Becker spoke with Stute about his allegations on multiple occasions. Becker thus engaged in protected conduct under the participation clause.

Becker additionally alleges that he engaged in several other forms of protected conduct, including reporting sexual orientation discrimination by Carr and assisting in the internal investigation of a complaint about Carr filed by one of his co-workers, Jill Bley. The Court, however, finds that these two activities were not protected conduct.  First, Becker has not offered any evidence that he ever complained to Jostens about Carr's purported sexual orientation discrimination.  Becker's written complaints are silent on the matter, and there is no indication from the record that he raised the complaint verbally with Stute or anyone else.  Becker may have perceived that Carr treated him a certain way because of his sexual orientation, but Jostens cannot be held liable for retaliating against Becker for complaints Becker has not shown he ever made.

Becker's contention that he engaged in protected conduct by assisting in the internal investigation of a complaint filed by Bley is similarly unavailing.  Becker asserts that he assisted in the Bley investigation by answering a question from Stute about Bley's complaint, and his answer constituted both protected opposition to unlawful conduct and participation in an investigation.  *See Hunt*, 282 F.3d at 1028.  But Becker's evidence does not support his argument.

First, while the Supreme Court has recognized that answering questions during an employer's internal investigation can constitute protected activity based on opposition to unlawful conduct, *see Crawford v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 555 U.S. 271, 276-80 (2009), a plaintiff must still show that he or she had a "good faith, objectively reasonable belief" that the underlying "practices were unlawful," *see Barker v. Mo. Dep't of Corr.*, 513 F.3d 831, 834 (8th Cir. 2008) (applying "good faith,

objectively reasonable" standard to "opposition clause" claim).   Here, Becker has not made that showing.   The **only** evidence that Becker puts forward regarding his involvement in the Bley investigation is that Stute asked him whether Carr told Bley and another co-worker during a meeting that if they did not "fucking fix themselves and their professionalism in this organization, they won't be around."   (*See* Second Stute Dep. at 241:18-244:4; 311:5-313:1.)   Although this alleged statement may be offensive to some, it does not implicate either Title VII or the MHRA.   As the Supreme Court has recognized, Title VII does not create a "general civility code" for the American workplace.   *Faragher*, 524 U.S. at 788.   Thus, Becker could not have had a good faith, objectively reasonable belief that Carr's comment was unlawful under Title VII or MHRA, and his answer to Stute's question accordingly did not amount to protected opposition to unlawful conduct.   Becker also did not participate in an investigation under Title VII or the MHRA.   Significantly, Becker has not offered any evidence to show that Bley made factual allegations of discrimination against a member of a protected group. *See Brower*, 178 F.3d at 1006.   Becker thus cannot rely on the participation clause in this instance to show protected conduct.

Altogether, the Court finds that Becker has made a prima facie showing that he engaged in protected conduct by reporting sexual harassment and retaliation by Carr, and by participating in the investigation of those complaints.

### b.   Adverse Employment Action

Jostens concedes that Becker's termination constitutes an adverse employment action.  This element of Becker's prima facie case is therefore satisfied.

### c.   Causation

The final prong of the prima facie case requires Becker to show that there is a causal connection between his protected conduct and the adverse employment action.  To establish causation, Becker must demonstrate that his "protected activity was a but-for cause of the alleged adverse action by the employer."  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013).  Here, the Court finds that Becker has offered sufficient evidence to meet this standard.

First, Becker was terminated only three weeks after he reported the alleged sexual harassment and retaliation, and the Eighth Circuit has recognized that temporal "[p]roximity alone can be enough to establish causation for a **prima facie** case." *Gibson*, 776 F.3d at 541; *see also Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002) (finding that a temporal gap of two weeks was sufficient to show prima facie causation).

Second, Becker has presented evidence that he received a significant promotion less than three months before his discharge. *See Scott v. Cty. of Ramsey*, 180 F.3d 913, 917 (8th Cir. 1999) (finding that evidence that the employer's stated reasons for discharge "were inconsistent with [the employee's] performance evaluation" lent support to an inference of causation).

Third, Becker has offered evidence suggesting that Mooty may have been involved in the termination decision, despite the fact that Jostens purportedly implemented nepotism safeguards to ensure that matters involving Carr would be handled by other senior executives.  As Mooty testified in his deposition, "any concerns that anybody might have as it relates to an issue with Ms. Carr" would "go directly to Cathy [Landman] or to Natalie [Stute] or to Marie [Hlavaty] . . . and it doesn't come to [him]." (Mooty Dep. at 81:24-82:8.)   Yet in spite of this safeguard, Stute emailed Becker's complaint to Mooty the same night that she received it, and Mooty responded within ten minutes, explaining how he would approach the situation, requesting that Stute call him the next morning to discuss the complaint, and directing that they "regroup on an approach" after Stute spoke with Carr.  (Second Stute Dep., Ex. 40 at 108.)   Stute also admitted in her deposition that she met with Mooty on a weekly basis and discussed, among other things, Becker's complaint and how it would be addressed.  (Second Stute Dep. at 97:15-98:9.)   Viewing this evidence in the light most favorable to Becker, a reasonable fact finder could conclude that Mooty played a role in the decision to terminate him, an apparent violation of the safeguard policy.  And as the Eighth Circuit has recognized, an employer's violation of its own policies can "lend[] support to an inference of improper motive." *Young v. Warner-Jenkinson Co.*, 152 F.3d 1018, 1024 (8th Cir. 1998); *see Fitzgerald v. Action, Inc.*, 521 F.3d 867, 874 (8th Cir. 2008) (finding that evidence that the employer failed "to discipline [the employee] according to

company policy" can support an inference of improper motive).   Thus, evidence of Mooty's involvement supports an inference of Jostens' retaliatory motive.[3]

Altogether, the Court finds that the above described evidence – including the timing of Becker's termination, his recent promotion, and Mooty's apparent violation of the nepotism safeguard – is sufficient to show a causal connection at the prima facie stage between Becker's protected conduct and his subsequent termination.

### d.   Non-Retaliatory Reason

Because Becker has made a prima facie showing of unlawful retaliation, the burden shifts to Jostens to offer a legitimate, non-retaliatory reason for the adverse action. As will be explained below, the Court finds that Jostens has met this burden.

---

[3] To show causation, Becker also argues that two other Jostens employees – Jill Bley and Janel Nnaji – were fired after making written complaints about Carr.  Becker asserts that their terminations lend additional support to the notion that he was fired in retaliation for reporting sexual harassment and retaliation perpetrated by Carr.  But the Court is not convinced.  Becker is correct that evidence of unlawful retaliation against other employees can support an inference of causation and retaliatory motive.  *See Hawkins v. Hennepin Tech. Ctr.*, 900 F.2d 153, 155-56 (8th Cir. 1990) (finding that "evidence of alleged acts of sexual harassment committed against . . . others" should not have been excluded at trial because it was relevant to the plaintiff's Title VII and MHRA retaliation claims).  Whether such evidence is relevant in a given case, however, is a fact-intensive question that "depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case." *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008); *Quigley v. Winter*, 598 F.3d 938, 951 (8th Cir. 2010) (finding that in an FHA action, the district court properly admitted evidence that the landlord-defendant's former tenants experienced sexual harassment similar to that experienced by the plaintiff).  Here, Becker has not shown that the terminations of Bley and Nnaji are closely related to the circumstances and theory of his case.  For example, there is no indication that Bley or Nnaji complained about sexual harassment and subsequent retaliation, and the Court cannot discern from the record whether Bley and Nnaji were fired by the same decision-makers.  The Court therefore declines to consider Becker's purported "me-too" evidence as relevant to the question of causation at this stage of the case.  The Court, however, is open to reconsidering this issue at trial, if Becker can make a greater showing of relevance at that time.

Jostens contends that it terminated Becker because he received a written reprimand on May 19, 2014, which warned him that he could lose his job if he did not improve his professionalism, and then, in spite of that warning, he made false allegations about Carr and attributed false statements to Tammy Kimbler in his June 13 written complaint.   According to Jostens, the combination of the initial reprimand and the June 13 complaint caused Jostens to have such "serious concerns about [Becker's] integrity and credibility" as to warrant his termination.  (Stute Decl. ¶ 37.)

Becker counters that his June 13 complaint cannot be cited as a justification for his termination because it was related to his earlier protected complaints.  Becker cites to *Womack v. Munson*, where the Eighth Circuit held that (1) an employer's reasons for discharge must be "sufficiently independent from the filing of the complaint to constitute legitimate and nonretaliatory reasons," and (2) a determination that an employee made false statements cannot be grounds for discharge where the statements at issue are "inextricable from [the employee's] protected charge."   619 F.2d 1292, 1297 (8th Cir. 1980).  Becker contends that his June 13 complaint was inextricably linked to his earlier protected conduct, and therefore, the purported falsity of his accusations cannot be a legitimate and nonretaliatory reason for his discharge.   The Court, however, is not persuaded.  An employee's false statements "**can** be legitimate reasons for termination" so long as they "are 'not part of the protected activity.'"  *Gilooly v. Mo. Dep't of Health & Senior Servs.*, 421 F.3d 734, 740 (8th Cir. 2005) (emphasis added).  And here, Becker's June 13 complaint had nothing to do with his earlier protected conduct.  There is no inextricable link between Becker's initial allegations that Carr sexually harassed and

retaliated against him and his participation in the investigation of those complaints, and his subsequent allegations that Carr violated Jostens' nepotism policy by directing a vendor to cast Carr's niece and retain the casting agency where Carr's sister worked.

### e.    Pretext

Because Jostens has met its burden of offering a legitimate and nonretaliatory reason for Becker's discharge, the burden shifts back to Becker to prove that the proffered "reason is merely a pretext and that retaliatory animus motivated the adverse action." *Pedersen v. Bio-Med. Applications of Minn.*, 775 F.3d 1049, 1054 (8th Cir. 2015) (quoting *Buytendorp v. Extendicare Health Servs., Inc.*, 498 F.3d 826, 834 (8th Cir. 2007)). While evidence that a plaintiff relies upon to show causation at the prima facie stage is generally insufficient to establish pretext, when that evidence "is quite strong, it may be sufficient, standing alone, to prove a defendant's liability without resort to further evidence." *Buytendorp*, 498 F.3d at 835. Here, the Court finds that Becker's prima facie evidence is just strong enough, standing alone, to create a genuine factual dispute on pretext.

Most significantly, Becker's evidence raises an inference that Mooty was involved in Becker's termination, despite the presence of the nepotism safeguards that were intended to wall him off from such decisions. While Jostens has offered evidence that Stute made the termination decision on her own, a reasonable jury could conclude that Mooty played a determinative role by virtue of his position as CEO and because he and Stute communicated about Becker's protected conduct. *See Qamhiyah v. Iowa State*

*Univ. of Sci. & Tech.*, 566 F.3d 733, 742 (8th Cir. 2009) (finding that "an employer cannot shield itself from liability for unlawful termination by using a purportedly independent person . . . as the decisionmaker where the decisionmaker merely serves as the conduit, vehicle, or rubber stamp by which another achieves his or her unlawful design").   And given Mooty's familial relationship to Carr, his apparent involvement raises a strong inference of a retaliatory motive – Mooty may have acted to protect his sister-in-law and to punish Becker for his protected conduct.   Evidence that Mooty was "spinning" about Becker's allegations bolsters this inference.   Altogether, Mooty's purported involvement, combined with the timing of Becker's termination and his recent promotion, is sufficient to allow a reasonable jury to find that Jostens' "proffered reason for the termination was a mere pretext to mask retaliatory animus." *Buytendorp*, 498 F.3d at 837.[4]

---

[4] Becker also argues that Jostens' reason for terminating him is "unworthy of credence," which is another ground upon which a plaintiff can show pretext. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (analyzing pretext in ADEA action); *see Gibson*, 776 F.3d at 540 (noting that in a Title VII retaliation action, a plaintiff can establish pretext "by showing the proffered explanation has no basis in fact").   As support, Becker contends that (1) he did not misrepresent Kimbler's comments and (2) Stute's investigation was so inadequate that she could not have concluded that the complaint was false.   But Becker has failed to offer sufficient evidence to establish a genuine factual dispute on either of these points.   Jostens has presented both deposition testimony and a declaration from Kimbler, in which she affirmed that she never told Becker that Carr directed her to cast Carr's niece or hire Carr's sister's casting agency, as well as contemporaneous email evidence showing that Carr asked for her niece to be removed from the project.   Becker offers no evidence to the contrary besides his own conclusory conjecture.   Additionally, Becker has not offered evidence demonstrating that Stute's investigation was inadequate.   To the contrary, the undisputed evidence shows that Stute interviewed both Kimbler and Carr, reviewed email evidence, and met with Becker to hear his side of the story.   And even if Becker could show that Stute's investigation could have been more comprehensive, courts have recognized that "[s]hortcomings in an investigation alone . . . are not enough to make a submissible case." *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005 (8th Cir. 2012) (analyzing pretext in ADA action).   Becker has thus failed to show, for summary judgment purposes, that Jostens' proffered reason is unworthy of credence.

(Footnote continued on next page.)

Overall, the Court will deny in part Jostens' motion for summary judgment on Becker's Title VII and MHRA claims because there are genuine issues of material fact regarding whether Jostens terminated Becker in retaliation for complaining about sexual harassment and retaliation perpetrated by Carr, and for participating in the investigation of those complaints.

## III. MWA CLAIM

Becker next brings a claim against Jostens under the MWA. The MWA provides that "[a]n employer shall not discharge, discipline, threaten, otherwise discriminate against, or penalize an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because . . . the employee . . . in good faith, reports a violation . . . of any federal or state law or common law." Minn. Stat. § 181.932, subd. 1(1). The elements of a prima facie case of retaliation under the MWA

---

(Footnote continued.)

The Court notes that Becker's failure to show that Jostens' proffered reason is unworthy of credence does not prevent him from satisfying his burden on pretext. A plaintiff may concede the veracity of the employer's stated discharge reason and nevertheless establish a triable issue regarding pretext by presenting evidence that the employer's true reason was unlawful retaliation. *See Buytendorp*, 498 F.3d at 835 (acknowledging that a plaintiff can still establish pretext in an MWA action even if she does "not challenge the veracity" of the employer's proffered reasons if she offers evidence that "these [reasons] were not the true motivation"); *see also Lors v. Dean*, 746 F.3d 857, 868 (8th Cir. 2014) (analyzing pretext in an ADA retaliation action and noting that "a plaintiff may concede that the proffered reason, if truly the motivating cause for the termination, **would have been** a sufficient basis for the adverse action while arguing that the employer's proffered reason was not the true reason for the action."). Here, Becker has offered such evidence – Mooty's apparent involvement, the temporal proximity, and Becker's recent promotion. And based on this evidence, a reasonable jury could conclude that Becker was actually terminated for reporting Carr's alleged sexual harassment and retaliation, and not for making false accusations in his June 13 complaint.

are "(1) statutorily-protected conduct by the employee; (2) adverse employment action by the employer; and (3) a causal connection between the two." *Cokley v. City of Otsego*, 623 N.W.2d 625, 630 (Minn. Ct. App. 2001) (quoting *Hubbard v. United Press Int'l, Inc.,* 330 N.W.2d 428, 444 (Minn. 1983)).  Here, Becker argues that Jostens violated the MWA by terminating him in retaliation for blowing the whistle on a common law battery perpetrated by Carr.[5]  Becker cites three reports, all from his May 29 complaint: that Carr hugged him and pushed his face into her breasts, that Carr punched a co-worker, and that Carr poked him in the back.  (May 29 Compl. at 37, 44, 48.)   Becker's claim fails, however, because he has not shown that he engaged in statutorily protected conduct or that there was a causal connection between his alleged reports and his termination.

---

[5] Becker also argues that he blew the whistle on Carr's criminal disorderly conduct, in violation Minn. Stat. § 609.72, subd. 1.  The Court, however, will decline to consider this claim because Becker did not raise it until he filed his brief in opposition to Jostens' summary judgment motion.  As the Eight Circuit has held, a party may not "manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment."  *N. States Power Co. v. Fed. Transit Admin.*, 358 F.3d 1050, 1057 (8th Cir. 2004).  Here, that is exactly what Becker is attempting to do.  As Jostens accurately points out, the complaint does not reference the statute or the crime; it does not appear that the parties engaged in any discovery on the matter; and most tellingly, Becker did not raise criminal disorderly conduct as a basis for his MWA claim at any time during briefing or at oral argument for his motion to amend his complaint to seek punitive damages for his MWA claim.  (*See* Notice of Removal, Ex. A ¶¶ 15-53, 123-128, Dec. 31, 2014, Docket No. 1; Pl.'s Mem. in Supp. of Mot. for Leave to Seek Punitive Damages, Jan. 7, 2016, Docket. No. 41; Tr., Feb. 2, 2016, Docket No. 63.)  The Court will not permit Becker to manufacture new claims at this stage of the case.  *See Schwab v. Altaquip LLC*, No. 14-1731, 2015 WL 5092036, at *6 (D. Minn. Aug. 28, 2015) (declining to consider an MWA claim based on a purported violation of the Minnesota Deceptive Trade Practices Act because the claim was not raised until summary judgment briefing; the "complaint ma[de] no reference" to the claim; the plaintiff "never gave . . . any indication that he was contending that [the defendant's] alleged conduct violated" the statute; and "[u]nsurprisingly, then, the parties did not pursue discovery on issues relevant to [the claim], whose elements differ from the elements needed to prove" the other sufficiently pleaded MWA claims).

To establish protected conduct under the MWA, a plaintiff must show that he or she, in "good faith," reported facts that, "if proven, would constitute a violation of law." *Abraham v. Cty. of Hennepin*, 639 N.W.2d 342, 354-55 (Minn. 2002). In evaluating whether a report constitutes protected conduct, a "central question is whether the report[ was] made for the purpose of blowing the whistle, i.e., to expose an illegality." *Obst v. Microtron, Inc.*, 614 N.W.2d 196, 202 (Minn. 2000).

> [T]he rationale for looking at the reporter's purpose at the time the report is made is to ensure that the report that is claimed to constitute whistle-blowing was in fact a report made for the purpose of exposing an illegality and not a vehicle, identified after the fact, to support a belated whistle-blowing claim.

*Id.* Courts have also consistently recognized that a report is not made for the purpose of exposing an illegality if the reporter acted merely to "protect" his or her job, and "not to protect the public." *Id.* (citing *Wolcott v. Champion Int'l, Corp.*, 651 F. Supp. 1052, 1059 (W.D. Mich. 1987)); *see Pedersen v. Bio-Med. Applications of Minn.*, 992 F. Supp. 2d 934, 941 (D. Minn. 2014) (finding that an employee did not in good faith blow the whistle in part because the purpose of her report was to protect her own job), *aff'd*, 775 F.3d 1049 (8th Cir. 2015); *Weigman v. Everest Institute*, 957 F. Supp. 2d 1102, 1108 n.2 (D. Minn. 2013) (finding that an employee's "attempt to defend her own misconduct [did] not reflect an intention to 'blow the whistle' but rather to shift the blame and save her job"). A "court may determine as a matter of law that certain conduct does not constitute a report." *Borgersen v. Cardiovascular Sys., Inc.*, 729 N.W.2d 619, 624 (Minn. Ct. App. 2007) (quoting *Rothmeier v. Inv. Advisers, Inc.*, 556 N.W.2d 590, 593 (Minn. Ct. App. 1996)).

Here, even if the Court were to assume that Becker reported facts that, if proven, constituted common law battery, the Court finds that his reports were not made for the purpose of blowing the whistle.  First, Becker expressly admitted that he submitted his May 29 complaint to Stute as a "rebuttal" to the written warning that he received several weeks earlier, in which he was warned that he could be terminated.  (First Becker Dep. at 200:21-201:7; May 29 Compl. at 34-36.)  As noted above, a report made for the purpose of protecting one's own job does not constitute actionable whistleblowing.  Moreover, the content of the May 29 complaint belies the notion that Becker acted to expose an illegality rather than to protect his own rights as an employee.  Becker wrote:  "I believe her latest tactics; threats and warnings are in an attempt to fire me before I can fully expose her.  She has threatened my job too many times."  (May 29 Compl. at 52.)  Becker then demanded that Carr be "investigated," that she cease her unruly conduct, that he be allowed to report to a different supervisor, and that Carr have no further contact with him. (*Id.*)  These allegations and demands simply do not show intent to blow the whistle on illegal batteries; instead, they suggest that Becker is merely using his alleged battery complaints to support a belated whistleblowing claim.[6]

---

[6] Becker appears to argue that he need not show that he made his reports for the purpose of blowing the whistle because of a recent amendment to the MWA.  But the Court disagrees.  It is true that the Minnesota Supreme Court in *Obst* directly linked the question of "the reporter's purpose at the time the reports were made" to the statutory requirement that the report be made in "good faith."  614 N.W.2d at 202.  And it is also true that the Minnesota legislature, in 2013, amended the MWA to provide that a party acts in "good faith" as long as he or she does not make a statement or disclosure knowing that it is "false" or "in reckless disregard of the truth." Minn. Stat. §§ 181.931, subd. 4, 181.932, subd. 3.  The Court does not find it true, however, that the legislature, by virtue of that amendment, intended to abrogate *Obst* such that a plaintiff who

(Footnote continued on next page.)

Alternatively, even if Becker could show that he intended to expose an illegality and that his battery reports amounted to protected conduct, he has failed to establish prima facie causation.  Causation under the MWA requires a showing of "retaliatory motive."  *Cokley*, 623 N.W.2d at 632-33.  Here, Becker's purported battery complaints took up only a few lines in a 16-page complaint, and were not specifically highlighted or labelled.  Furthermore, although Becker referred prominently to sexual harassment, his complaint never once used the word battery or any related language – besides the factual allegations themselves – that would have put Jostens on notice that he was reporting batteries.  Thus, although an employee need not actually "identify the specific law or rule that the employee suspects has been violated" for a complaint to be MWA-protected, *Abraham*, 639 N.W.2d at 354-55, it is neither plausible nor reasonable that Jostens terminated Becker for making nearly invisible and/or indistinguishable reports about common law battery.

---

(Footnote continued.)

did not actually intend to expose an illegality could use the MWA as a vehicle, after the fact, to support a whistleblower claim.  That would contradict a basic purpose of the MWA, which is to protect parties who come forward to blow the whistle on violations of law.  The Court also notes that § 181.932, subdivision 1(1) still requires the plaintiff to have made a "report," which is defined under the statute as "a verbal, written, or electronic communication by an employee about an actual, suspected, or planned violation of a statute, regulation, or common law."  *Id.* §§ 181.931, subd. 6, 181.932, subd. 1(1).  If the plaintiff did not make a report for the purpose of blowing the whistle, then it cannot be said that the report was "**about** an actual, suspected, or planned violation of a statute, regulation, or common law."  The Court thus rejects Becker's argument.

The Court will accordingly grant Jostens' summary judgment motion with respect to Becker's MWA claim.[7]

## IV.    DEFAMATION CLAIM

Becker lastly brings a defamation claim against Jostens, alleging that Landman defamed him by accusing him of "lying" and "making false accusations" in his June 13 complaint.  To establish defamation, Becker

> must prove three elements: (1) the defamatory statement is "communicated to someone other than the plaintiff," (2) the statement is false, and (3) the statement "tend[s] to harm the plaintiff's reputation and to lower [the plaintiff] in the estimation of the community."  If the defamation "affect[s] the plaintiff in his business, trade, profession, office or calling," it is defamation per se and "thus actionable without any proof of actual damages."

*Bahr v. Boise Cascade Corp.*, 766 N.W.2d 910, 919-20 (Minn. 2009) (quoting *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 256 (Minn. 1980)).  Here, the Court will grant summary judgment for Jostens because Becker has not established that there is a genuine issue of material fact regarding whether the statements were false.

Becker's June 13 complaint attributed multiple statements to Kimbler, including that (1) Pixel Farm "cast a teenager named Jill Sampson per Ann's direction" and it "was just crazy for Ann or Chuck not to reveal Jill Sampson was their 1st niece," (2) "Ann instructed [Pixel Farm] to work with Wehmann Models & Talent," which is the agency where Carr's sister worked, and (3) "nepotism . . . is against Pixel Farm's company

---

[7] Because Becker has not established protected conduct or causation, the Court need not reach the parties' other arguments about the viability of his MWA claim.

policy." (June 13 Compl. at 134.)  For Becker to prove that Landman's remarks were false, he must show that Kimbler actually made the above statements or that he had some reason to believe that she did.  Becker, however, has not demonstrated a **genuine** dispute on these issues.

A dispute is only genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Viewing the evidence in the light most favorable to Becker and without making any credibility determinations – as the Court must do on summary judgment – the Court concludes that no reasonable jury could return a verdict in Becker's favor. Becker's only evidence supporting that Kimbler actually made the alleged statements or that he reasonably believed that she did is his own deposition testimony.  While a party's own deposition testimony is oftentimes sufficient to create a genuine factual dispute, such is not the case here.

First, email evidence from June 6, 2014, shows that Carr asked Kimbler to remove Sampson from the video project, which directly contradicts Becker's version, that Carr directed Kimbler to cast Sampson and that Kimbler told Becker as much.  (Second Stute Dep., Ex. 49 at 136-37.)  Second, Kimbler, affirmed in both her deposition and a sworn declaration that she did not tell Becker that Carr instructed her to cast Sampson and work with Wehmann Models & Talent, or that Pixel Farms has an anti-nepotism policy. (Kimbler Dep. at 64, 72-73; First Becker Dep., Ex. 44 ¶ 13.)

To establish a genuine dispute on the issue of falsity, Becker needed to offer **some** evidence to counter the emails and Kimbler's account, to discredit Kimbler, or to explain

why he might have interpreted Kimbler's statements in the manner he did.  But Becker has not done this.  In his deposition, Becker merely testified that the allegations in his June 13 complaint were "true," "nothing's fabricated," and he "could definitely poke holes in what Tammy Kimbler reported back."  (First Becker Dep. at 59:19-21, 291:25-2.)  Yet he only elaborates on one deficiency in Kimbler's testimony and declaration – she misstated the date of their conversation.  (*Id.* at 59:19-25.)  On this evidence, no reasonable jury could find that Kimbler actually made the statements that Becker attributed to her or that Becker had some reason to believe that she did; in other words, while there is a factual dispute, it is not a genuine one.  Because of this, no reasonable jury could find that Landman's statements were false.  The Court will thus grant summary judgment for Jostens on Becker's defamation claim – Becker has failed to make a showing sufficient to establish the existence of an element essential to his defamation claim and on which he will bear the burden of proof at trial, the falsity of the allegedly defamatory statement.

## V.    APPEAL OF MAGISTRATE JUDGE ORDER

Finally, Becker appeals the Magistrate Judge's order denying his motion to amend his complaint to seek punitive damages for his MWA claim.  However, because the Court will grant summary judgment for Jostens on Becker's MWA claim, the Court will deny the appeal as moot.

This case will be placed on the Court's next available trial calendar.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Jostens' Motion for Summary Judgment [Docket No. 64] is **GRANTED in part** and **DENIED in part**:

     a.      The motion is **DENIED** with respect to Becker's Title VII and MHRA retaliation claims regarding his sexual harassment and retaliation complaints, and his participation in the investigation of those complaints.

     b.      The motion is **GRANTED** in all other respects.

2.      Becker's Appeal of the Magistrate Judge's Order [Docket No. 70] is **DENIED as moot**.

DATED:   September 26, 2016
at Minneapolis, Minnesota.

               s/ John R. Tunheim
               JOHN R. TUNHEIM
               Chief Judge
               United States District Court